1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6
7
8
9
10
11
12

DEL ALLAN BIRMINGHAM,

                                    Plaintiff,

        v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                                    Defendant.

Case No. 3:10-cv-05215-KLS

ORDER AFFIRMING DEFENDANT'S
DECISION TO DENY BENEFITS

13
14
15
16
17
18
19

        Plaintiff has brought this matter for judicial review of defendant's denial of his

applications for disability insurance and supplemental security income ("SSI") benefits.

Pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73 and Local Rule MJR 13, the

parties have consented to have this matter heard by the undersigned Magistrate Judge.  After

reviewing the parties' briefs and the remaining record, the Court hereby finds that for the reasons

set forth below, defendant's decision to deny benefits be affirmed.

20

FACTUAL AND PROCEDURAL HISTORY

21
22
23
24
25
26

        On February 2, 2006, plaintiff filed an application for disability insurance and another for

SSI benefits, alleging disability as of August 14, 2002, due to hearing loss, chronic pain

syndrome, back problems, sleep apnea, depression, and an overactive bladder. See Tr. 9, 109,

116, 145.  Both applications were denied upon initial review and on reconsideration. See Tr. 9,

78, 83.  A hearing was held before an administrative law judge ("ALJ") on June 4, 2009, at

which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See Tr.

ORDER - 1

28-50.

On July 13, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled.[1]  See Tr. 9-27.  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on February 5, 2010, making the ALJ's decision defendant's final decision.  See Tr. 1; see also 20 C.F.R. § 404.981, § 416.1481.  On March 29, 2010, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's decision.  See (ECF #1).  The administrative record was filed with the Court on June 2, 2010.  See (ECF #8).  The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for an outright award of benefits, because the ALJ erred: (1) in evaluating the medical in the record; (2) in assessing plaintiff's credibility; and (3) in finding him to be capable of performing other jobs existing in significant numbers in the national economy.  For the reasons set forth below, the Court does not agree that the ALJ erred in determining plaintiff to be not disabled, and therefore hereby finds that the ALJ's decision should be affirmed.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination.  See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F.

---

[1] The ALJ also amended plaintiff's alleged onset date of disability to October 7, 2005, in light of a previous adverse decision issued by a different ALJ on October 6, 2005. See Tr. 9, 56-70.

ORDER - 2

1   Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational

2   interpretation, the Court must uphold defendant's decision.  See Allen v. Heckler, 749 F.2d 577,

3   579 (9th Cir. 1984).

4   I.       The ALJ's Evaluation of the Medical Evidence in the Record

5           The ALJ is responsible for determining credibility and resolving ambiguities and

6   conflicts in the medical evidence.  See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).

7   Where the medical evidence in the record is not conclusive, "questions of credibility and

8   resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639,

9   642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v.

10  Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999).  Determining

11  whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at

12  all) and whether certain factors are relevant to discount" the opinions of medical experts "falls

13  within this responsibility." Id. at 603.

14          In resolving questions of credibility and conflicts in the evidence, an ALJ's findings

15  "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this

16  "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

17  stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences

18  "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the Court itself may

19  draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881

20  F.2d 747, 755, (9th Cir. 1989).

21          The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted

22  opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

23  1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can

ORDER - 3

only be rejected for specific and legitimate reasons that are supported by substantial evidence in

the record." Id. at 830-31.  However, the ALJ "need not discuss *all* evidence presented" to him

or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984)

(citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative

evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981);

Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of

those who do not treat the claimant. See Lester, 81 F.3d at 830.  On the other hand, an ALJ need

not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and

inadequately supported by clinical findings" or "by the record as a whole." Batson v.

Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v.

Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.

2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a

nonexamining physician." Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may

constitute substantial evidence if "it is consistent with other independent evidence in the record."

Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.     Dr. Bitter

In regard to plaintiff's treating physician, the ALJ found in relevant part as follows:

A series of Washington State Department of Social and Health Services
physical evaluation [sic] were completed by the claimant's treating physician,
Cordon Bittner, M.D. . . . , on November 3, 2004, April 26, 2005, December
7, 2005, September 15, 2006, January 26, 2007 and on April 30, 2007.  These
assessments were nearly identical.  The diagnoses included chronic lumbar
pain and hearing loss that would "markedly" interfere with the claimant's
ability to perform work-related activities.  Obesity ranged from "moderately"
limiting to "markedly" limiting; diabetes and sleep apnea were also mentioned
but would only "moderately" interfere with the claimant's ability to work.  Dr.
Bittner considered the claimant's hearing loss "profound" in one assessment

ORDER - 4

but later stated it would only have "moderate" limitations in the claimant's ability to perform work activities.

Treatment consisted of physical therapy for his back and hearing aids. The work level ranged from sedentary to severely limited; he opined that the claimant could only sit, stand or walk briefly at one time. Postural restrictions included balancing, bending, climbing, crouching, kneeling, pulling, pushing and stooping. The claimant's limitations would be expected to last at least twelve months. Treatment that would improve employability included weight loss. Dr. Bittner cited the claimant's "poor motivation" as a barrier to work. He would be unable to participate in pre-employment activities entirely because of hearing loss. A range of motion examination was given, showing some limitations in the claimant's back extension. Exhibits 4F/32 - 37, 42 - 46, 48 - 53, 14F/2 - 5, 17F/2.

Great weight is given to the claimant's severe impairments because they are supported by the record. Little weight, however, is given to the remainder of these opinions. Dr. Bittner did not provide objective evidence to support his findings. Generally, the record is not unsupportive of "profound" hearing loss, which has been treated with hearing aids or the claimant's ability to sit, stand or walk only briefly. Dr. Bittner also failed to account for some of the differences between the evaluations. Further, no justification is given to limit the claimant to sedentary/severely limited work and no objective evidence was supplied to support this limitation. Lastly, Dr. Bittner completed a standard form that lacks detailed explanations about his findings and therefore it is reasonable to assume that he relied mostly on the claimant's subjective complaints.

Physical capacities evaluations were further performed by Dr. Bittner on June 24, 2005, February 25, 2008 and on April 23, 2009. In 2005 Dr. Bittner opined that the claimant could sit for four hours out of an eight hour workday, stand/walk for about two hours and occasionally lift up to twenty pounds. The claimant could occasionally bend, squat, crawl, climb and reach above shoulder level. The claimant could not work around unprotected heights and had moderate limitations in moving machinery and driving automotive equipment. Dr. Bittner stated that the claimant would miss more than four days a month due to his impairments. He opined that he did not think the claimant could work at all due to chronic pain and hearing loss. Exhibits 4F/39 -40. The assessment in 2008 was identical in the claimant's ability to sit/stand and walk. However, in 2008 he limited the claimant to lifting only up to ten pounds, the claimant could not push/pull with his hands, he was unable to use his feet for repetitive movements and he could never bend, squat, crawl or climb. By 2009 he determined that the claimant could only walk for one hour during the entire day. He remarked that the claimant was deaf, morbidly obese and poorly motivated to change his lifestyle. Exhibits 25F/I - 3, 35F/I - 3.

ORDER - 5

> I give little weight to these opinions.  Dr. Bittner did not provide any relevant evidence to support these assessments, such as medical signs and laboratory findings.  No objective examination or explanation was provided to validate his conclusions.  Based on the longitudinal evidence in the record, I find the claimant capable of a greater residual functional capacity, . . . consistent with light work.  I agree with the limitation, however, regarding moving machinery because the claimant's physical impairments, particularly his back and obesity, could somewhat impair his movement; his hearing limitations could also hinder his ability to work around this type of equipment safely.  These limitations have been incorporated in the residual functional capacity.

Tr. 20-21.  Plaintiff challenges the ALJ's statement that Dr. Bittner did not provide any relevant evidence to support his findings or validate his conclusions.  Specifically, plaintiff notes that Dr. Bitter had treated him since at least 2004, that Dr. Bittner provided both treatment records and numerous completed physical evaluation forms, and that there is medical evidence in the record of profound hearing loss,[2] back impairments (including severe degenerative changes and limited spine range of motion), a chronic pain syndrome and obesity.

None of the evidence plaintiff cites, however, provides actual support for the significant functional limitations assessed by Dr. Bittner, as found by the ALJ. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment or symptoms is insufficient proof of disability).  Indeed, nowhere in any of the treatment notes he provided or the physical evaluation reports he completed, did Dr. Bittner explain how the clinical findings he did make supported his resulting assessments.  Nor can any clear link, direct or indirect, be made between the objective findings that are contained in those notes and the severity of the functional limitations contained in the forms. See Tr. 206-11, 214-17, 237-40, 244-45, 247-50, 253-56, 278-81, 409-12, 426-29, 446-49, 680-81, 731-32, 739-40, 746-50, 753-57, 760-61, 764-65, 844-45.  The ALJ thus did not err in rejecting Dr. Bittner's conclusions on this basis.

---

[2] It should be noted here that the ALJ actually found that the record was "not unsupportive of 'profound' hearing loss," but that it had been "treated with hearing aids." Tr. 21 (emphasis added).

ORDER - 6

It is true, as pointed out by plaintiff, that it is insufficient for an ALJ to reject the opinion of a treating physician by merely stating, without more, that there is a lack of objective medical findings in the record to support that opinion. See Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir. 1988). The ALJ's statements regarding lack of objective medical support for the assessments of Dr. Bittner, however, come immediately following a detailed discussion of the latter. The Court thus could logically infer from this discussion that the ALJ had thoroughly reviewed the clinical findings in the record from Dr. Bittner – both those in his treatment notes and any provided in the evaluation forms he submitted – and then rationally concluded they insufficiently supported Dr. Bittner's assessments. Magallanes, 881 F.2d at 755, (Court may draw specific and legitimate inferences from ALJ's opinion).

Plaintiff also argues the ALJ was required to take into account Dr. Bittner's "subjective judgments," and not just his "clinical findings and interpretation of test results." Lester, 81 F.3d at 832-33; Embrey, 849 F.2d at 422. But in Lester, the Ninth Circuit faulted the ALJ for having rejected the opinion of the claimant's treating physician as being "based not on an independent conclusion, but rather primarily on the prompting of the [claimant's] attorney and [an examining physician]." Lester, 81 F.3d at 832. In other words, the ALJ overlooked the fact that the treating physician, who had himself seen the claimant prior to issuing his opinion, could base an opinion at least in part on his "subjective judgment" of the objective medical evidence of the claimant's condition, even if that evidence may not have consisted, or consisted primarily, of his or her own "clinical findings." Id. In Embrey, the ALJ simply did not address the specific medical opinions contained in the record. See Embrey, 849 F.2d at 421-22.

Even where a treating physician's conclusions are based partly or completely on his own "subjective judgments," furthermore, those judgments still must be supported in the record. But

ORDER - 7

here, the ALJ expressly addressed the clinical findings and opinions of Dr. Bittner, and properly

noted none of the clinical findings supported those opinions.  Nor did Dr. Bittner appear to base

his opinions on other medical evidence in the record that might have provided additional support

for his "subjective judgments."  As such, the ALJ did not err here.

B.   Dr. Adams

Plaintiff next challenges the following findings made by the ALJ:

Brian Adams, Ph.D. performed a recent assessment on December 29, 2008.
The claimant stated that his chief complaint was not being able to sit down,
stand or walk.  Dr. Adams specifically mentioned in his evaluation that he
received [examining psychologist] Dr. [Robert E.] Schneider's evaluations
and his evaluation differed in some "important ways."  A mental status
examination showed the claimant could repeat three objects immediately and
again after a short delay.  He could spell the word "world" backward.  He
could name two objects, follow a three step verbal command and read a
written command and comply.  His responses throughout the interview and his
history suggested fair judgment.  A Wechsler Adult Intelligence test was
performed.  The claimant's IQ scores were; Verbal, 82, which fell within the
low average range, Performance, 102 and Full Scale 90, which both fell
within the average range.

Overall, Dr. Adams opined that his observation and the data collected in the
assessment suggested that the claimant's intelligence was within the average
range.  He recognized that the 2007 assessment from Dr. Schneider found
lower scores.  This suggested that the claimant was either at a higher level of
functioning that [sic] he had been previously or that he had made a more
concerted effort on the current testing.  He specifically concluded that whereas
the claimant's previous scores qualified him for Borderline Intellectual
Functioning, his current scores did not. Exhibits 29F /1 - 14.  I accord
significant weight to this opinion because it is recent, Dr. Adams performed
objective testing, his findings are consistent with the record as a whole and
Dr. Adams provided supporting explanations for his opinion.

Tr. 24.  Specifically, plaintiff argues the ALJ erred for failing to adopt the global assessment of

functioning ("GAF") score of 42, which Dr. Adams also assessed (see Tr. 720), since, at the very

least, such a score is evidence of potential serious functional impairment.

A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental

ORDER - 8

health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue,

500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to

function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). "A GAF score

of 41-50," furthermore, "indicates '[s]erious symptoms . . . [or] serious impairment in social,

occupational, or school functioning,' such as an inability to keep a job." Pisciotta, 500 F.3d

1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders

(Text Revision 4th ed. 2000); Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007) ("[A] GAF

score in the forties may be associated with a serious impairment in occupational functioning.").

On the other hand, while a GAF score thus may be "of considerable help" to the ALJ in

assessing a claimant's residual functional capacity,[3] "it is not essential" to the accuracy thereof.

Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). As such, an

ALJ's "failure to reference the GAF score" in assessing a claimant's residual functional capacity

"standing alone" does not make that assessment inaccurate. Id. In other words, the mere fact that

a low GAF score may have been assessed by a medical source is not alone sufficient to establish

disability or the presence of significant work-related limitations. Accordingly, although it is true

that, as plaintiff asserts, the GAF score Dr. Adams assessed potentially could reflect the presence

of serious impairments in social or occupational functioning, Dr. Adams did not give any opinion

regarding plaintiff's ability to perform work-related activities.

In addition, as noted by the ALJ, the evaluation Dr. Adams performed at the time showed

---

[3] Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step of the evaluation process, the disability determination is made at that step, and the process ends. Id. If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four of the sequential evaluation process to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id. It thus is what the claimant "can still do despite his or her limitations." Id.

ORDER - 9

higher functioning than previously had been shown on formal evaluation, and there is no further

indication that Dr. Adams believed plaintiff to be significantly restricted in his ability to perform

work.  Coupled with the fact that, as also noted by the ALJ, the "chief complaint" voiced by

plaintiff at the time concerned his physical limitations, and he "made no mention of any mental

health difficulties" (Tr. 709) – and that, as discussed in greater detail below, plaintiff has failed

to show the ALJ erred in evaluating the other medical evidence in the record regarding plaintiff's

mental impairments and limitations – the Court finds any error committed by the ALJ here to be

harmless. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir.

2006) (error harmless where non-prejudicial to claimant or irrelevant to ALJ's ultimate disability

conclusion).

C.     Dr. Malcom

Plaintiff challenges as well the following findings of the ALJ:

Maria W. Malcolm, Ph.D. performed a psychological evaluation on May 14,
2009.  A mental status examination showed the claimant could repeat four
digits in the forward direction and three backward.  He could complete two
out of five computation tasks, repeat three words immediately upon
presentation and recall three out of three words after a seven minute delay.
The MMPI-2 test was completed; the scores showed the claimant lacked
psychological insight and he emphasized some somatic issues to the virtual
exclusion of the psychological issues.  Dr. Malcom opined that the claimant
presented with borderline cognitive functioning. She noted that the claimant's
depression was in self-reported remission.  Physically, she stated he had
marked hearing loss, hypertension and diabetes; he walked with a cane.  The
prognosis for vocational functioning was poor due to the claimant's limited
vocational functioning followed by a long period of unemployment.  She
further opined that the claimant could encounter difficulty completing tasks at
a competitive rate and learning new tasks due to borderline cognitive
functioning.  Judgment would be compromised by cognitive limitations.  He
had a GAF score of 43, indicating serious symptoms.

Dr. Malcolm followed up with a Washington State Department of Social and
Health Services psychological/psychiatric evaluation. She specifically stated
that she accepted Dr. Schneider's assessment in 2007, with a full scale IQ
score of 75.  As discussed previously, this score is questionable.  Dr. Malcom

indicated the claimant had marked social withdrawal, marked limitations in his ability to understand complex instructions, learn new tasks and exercise judgment.  In social factors, the claimant had a marked limitation in his ability to tolerate and respond the expectations and pressures of work. Exhibits 36F/I - 9.

Little weight is given to Dr. Malcolm's assessment due to the limited objective testing performed; she seemed to rely heavily on the claimant's self reporting.  As discussed in Dr. Adams assessment, the diagnosis of borderline intellectual functioning has been negated by his assessment and therefore is a questionable diagnosis.  As discussed throughout this decision, the claimant is capable of performing at least simple, repetitive tasks.  Concerning her statement that the claimant's vocational functioning was deemed poor, the claimant has consistently worked in the past, showing he is capable of performing some type of work.  Physically, no medical examination was given in this evaluation, giving little weight to her discussion about the claimant's impairments.  However, I note that it is unclear why the claimant would need the assistance of a cane when his back pain has been determined to be mild; it is possible he attempted to portray more extensive limitations than were actually present in order to increase the chance of obtaining benefits.

Tr. 25.  Plaintiff argues the ALJ erred in rejecting Dr. Malcolm's opinion on the basis that little objective testing had been performed.

The Court agrees this is not a valid basis for rejecting Dr. Malcolm's opinion.  Objective clinical and laboratory data may consist of diagnoses and observations of professionals trained in psychopathology:

Courts have recognized that a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as is a medical impairment and that consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.  In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of mental illness. . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnoses and observations of professionals trained in the field of psychopathology.  The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic technique.

ORDER - 11

1   Sanchez v. Apfel, 85 F. Supp.2d 986, 992 (C.D. Cal. 2000) (quoting Christensen v. Bowen, 633

2   F.Supp. 1214, 1220-21 (N.D.Cal.1986)) (emphasis added); see also Sprague v. Bowen, 812 F.2d

3   1226, 1232 (9th Cir. 1987 (opinion that is based on clinical observations supporting diagnosis of

4   depression is competent evidence).  Thus, it is not proper to reject the opinion of an examining

5   psychologist or psychiatrist merely because there are no formal psychological testing findings in

6   his or her report.

7           The Court further notes that Dr. Malcolm herself did perform psychological testing. See

8   Tr. 848-49.  Nor is it exactly clear why the ALJ deemed such testing to be "limited" in nature or

9   what further testing the ALJ believed should have been performed.  In addition, Dr. Malcolm

10   performed a mental status examination of plaintiff, which on its own has been found to be a

11   proper basis on which to found a medical diagnosis. See Clester v. Apfel, 70 F.Supp.2d 985, 990

12   (S.D. Iowa 1999) ("The results of a mental status examination provide the basis for a diagnostic

13   impression of a psychiatric disorder, just as the results of a physical examination provide the

14   basis for the diagnosis of a physical illness or injury.").  Accordingly, it is not at all clear as the

15   ALJ stated, that Dr. Malcolm relied "heavily" on plaintiff's self-reporting.

16           The ALJ, however, gave other valid reasons for rejecting Dr. Malcolm's opinion.  For

17   example, Dr. Malcolm based her opinion primarily on her diagnosis of "borderline cognitive

18   functioning" – which, in turn, was based on prior intelligence testing and the related diagnosis of

19   borderline intellectual functioning provided by Dr. Schneider – that the ALJ discounted. See Tr.

20   23-25, 847, 849-50.  As plaintiff has not challenged the ALJ's rejection of the medical evidence

21   provided by Dr. Schneider, the Court finds that the ALJ did not err in rejecting it,[4] or in rejecting

---

[4] See Carmicle v. Commissioner of Social Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (issue not argued with specificity in briefing will not be addressed); Paladin Associates, Inc. v. Montana Power Co., 328 F.3d 1145, 1164 (9th Cir. 2003) (by failing to make argument in opening brief, objection to district court's grant of summary

ORDER - 12

the opinion of Dr. Malcolm on this basis.  Nor has plaintiff challenged the ALJ's statement that

he had "consistently worked in the past," which clearly contradicts the "poor" prognosis that Dr.

Malcolm assessed plaintiff with based in part on "his history of limited vocational functioning."

Tr. 25, 849.  These reasons were sufficient to reject Dr. Malcolm's opinion.

II.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at

642.  The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580.

In addition, the Court may not reverse a credibility determination where that determination is

based on contradictory or ambiguous evidence. See id. at 579.  That some of the reasons for

discrediting a claimant's testimony should properly be discounted does not render the ALJ's

determination invalid, as long as that determination is supported by substantial evidence.

Tonapetyan , 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent

reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what

testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also

Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the

claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear

and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of

malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of

credibility evaluation," such as reputation for lying, prior inconsistent statements concerning

symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273,

---

judgment was waived); Kim v. Kang, 154 F.3d 996, 1000 (9th Cir.1998) (matters on appeal not specifically and
distinctly argued in opening brief ordinarily will not be considered).

1   1284 (9th Cir. 1996)].  The ALJ also may consider a claimant's work record and observations of

2   physicians and other third parties regarding the nature, onset, duration, and frequency of

3   symptoms.  See id.

4          The ALJ in this case provided a number of legitimate reasons for discounting plaintiff's

5   credibility.  First, the ALJ noted plaintiff's subjective complaints were "not reasonably consistent

6   with the medical evidence" in the record regarding both her mental and physical impairments.

7   Tr. 18.  A determination that a claimant's subjective complaints are "inconsistent with clinical

8   observations" can satisfy the clear and convincing requirement.  Regennitter v. Commissioner of

9   SSA, 166 F.3d 1294, 1297 (9th Cir. 1998).  Plaintiff challenges this reason as a basis for finding

10  her to be not fully credible, but as discussed above, the ALJ did not err overall in his evaluation

11  of the medical evidence in the record, and thus he did not err here in finding it failed to support

12  plaintiff's claims of disabling symptoms and limitations.

13         The ALJ next discounted plaintiff's credibility for the following reasons:

14
15      The claimant has contributed, at least in part, to his condition.  Dr. Bittner, in
        his evaluations . . . noted the claimant's poor motivation as a work barrier.  He
16      also stated the claimant had little motivation to lose weight, which was
        contributing to his overall condition.  Specifically, he was advised by his
17      treating physician to lose weight. Exhibits 14F/5, 20F/5, 23F/84.  He further
        stated that the claimant was not monitoring his diabetes or blood pressure.
18      His primary care physician stated the claimant had a lack of motivation to lose
        weight or to adequately care for his diabetes. Exhibits 17F/5, 32F135.  In
19      2008, as discussed above, the claimant admitted that he quit taking his
        diabetes medications and was not testing, leading to uncontrolled diabetes.
20      Exhibit 27F/3.  The claimant reported binging after not eating for a significant
        amount of time, raising his blood sugar levels. Exhibit 18F/2.  The claimant
21      also [sic] a number of "no show" appointments at counseling, suggesting that
        he lacked motivation to treat his mental impairments. Exhibits 22F/37 - 38,
22      43, 45, 48, 52 - 54, 56, 61.

23      Secondary gain issues may also be present.  The claimant reported to Dr.
24      Schneider during his psychological assessment, discussed below, that he was
        depressed because he was unable to qualify for Social Security Income
25      benefits and thus was unable to pay his bills. Exhibit 16F/2.  He also stated at
26

ORDER - 14

the emergency room, where he presented with suicidal thoughts, that he was unhappy about his living situation but did not have the income to change it. Exhibit 16F/60.  Similarly, he admitted that he could perform all of his activities of daily living with few limitations but he did not "have any money." Exhibit 19F/2.

I further note that the claimant is supported by GAU/food stamps and has repeatedly applied for Social Security Income, receiving numerous denials. He stated that he was "frustrated" that he could not qualify for disability income.  During counseling he stated that all he needed to start getting better was "the money."  The claimant expressed that he was trying to "secure Social Security Income."  He explicitly stated that he found it difficult to live on GAU income and felt [sic] in a very difficult situation financially. Exhibits 19F/3, 22F/14 -15, 39, 22F/63, 36F/3.  During the recent evaluation with Dr. Adams, he stated benefits would help him "get into his own place with his own stuff and be independent." Exhibit 29F/5.  These examples suggest that the claimant could be attempting to portray more extensive limitations than are actually present in order to increase the chance of obtaining benefits.

There is further evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments.  According to the claimant's assessment with Dr. Schneider . . . he was working as a truck delivery driver as recently as 2004, for two years, until he was "fired because he had too many motor vehicle accidents."  He further elaborated that he was "laid off" from his job prior to the 2004 job. Exhibit 16F/3.  The claimant also reported this to Dr. Adams during a more recent evaluation; he stated that he left some jobs because he was fired and some of the jobs he voluntarily left. However, he had successfully maintained employment for seven years with one employer and he reported no history of interpersonal difficulties on the job. Exhibits 29F/2 - 3, 36F/2.  The fact that the claimant's impairments did not prevent the claimant from working prior to his amended onset date strongly suggests that it would not currently prevent work.

Tr. 18-19.  These are all valid reasons for discounting plaintiff's credibility, none of which have been challenged by plaintiff. See Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ may consider issue of motivation and secondary gain in rejecting symptom testimony); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992) (same); see also Smolen, 80 F.3d at 1284 (ALJ may consider claimant's work record); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert a good reason for not following prescribed course of treatment can cast doubt on sincerity of claimant's testimony).

ORDER - 15

Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

> Additionally, the claimant can perform a full range of daily activities which is inconsistent with the nature, severity and subjective complaints of the claimant.  The claimant was able to drive unassisted to his physical evaluation with Dr. [Richard] Price[, M.D.], . . . Exhibit IF/I.  According to the claimant, he loved computers, regularly used them and in fact stated he could build his own computers. Exhibit IF/2.  He stated during the psychological assessment with Dr. Schneider, discussed below, that he spent his day playing computer games. Exhibit 19F/2.  The claimant also reported staying up all night "working on computer problems." Exhibit 22F/30.  When specifically asked about daily assistance needs by Dr. Adams during his assessment, the claimant reported "none."  He could prepare meals and he played cards with his mother. Exhibit 29F/3.  These activities do not reflect the disabling limitations alleged by the claimant.

Tr. 19.  To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284.  Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7.  The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues the ALJ failed to find he performed the activities described above for a substantial part of the day or that those activities are transferable to a work setting.  But the Ninth Circuit has held that an ALJ need not recite "magic words" in his or her decision, as "it serves no purpose to require every step of each decisional process to be enunciated with precise words and phrases drawn from relevant disability regulations." Magallanes, 881 F.2d at 755; see also Renner v. Heckler, 786 F.2d 1421, 1424 (9th Cir. 1986).   Indeed, such a finding can be inferred from the ALJ's discussion above.  For example, the ALJ noted plaintiff reported on one occasion that he spent his day playing on his computer, and on another occasion that he had stayed up all night "working on computer problems," indicating not only an ability to perform activities for a

ORDER - 16

substantial part, if not all, of a normal workday, but performing activities, i.e., using a computer,

that clearly are transferrable to a work setting.

III.     The ALJ's Step Five Determination

In this case, the ALJ found plaintiff had the following residual functional capacity:

> **. . . the claimant has the residual functional capacity to perform light work . . . The claimant can frequently lift ten pounds and occasionally twenty five pounds.  The claimant can sit for six hours out of an eight hour workday. The claimant can stand/walk approximately six hours out of an eight hour workday.  The claimant needs to sit/stand at will.  The claimant cannot work around large moving machinery.  The claimant cannot work where fine hearing would be required.  The claimant is limited to simple, repetitive tasks.**

Tr. 17 (emphasis in original).  If a claimant cannot perform his or her past relevant work, at step

five of the disability evaluation process the ALJ must show there are a significant number of jobs

in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99

(9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the

testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines.

Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the

hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987);

Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony

therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See

Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the

claimant's disability "must be accurate, detailed, and supported by the medical record." Id.

(citations omitted).  The ALJ, however, may omit from that description those limitations he or

she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert containing

ORDER - 17

substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual

functional capacity. See Tr. 48.  In response to that hypothetical question, the vocational expert

testified that an individual with those limitations – and who had the same age, education and

work background as plaintiff – could perform other jobs, specifically that of electronics worker

and small products assembler. See Tr. 48-49.  Based on the vocational expert's testimony, the

ALJ found plaintiff to be capable of performing both jobs, and therefore of performing other jobs

existing in significant numbers in the national economy, which, in turn, resulted in a finding of

non-disability. See Tr. 26-27.

Plaintiff argues the ALJ erred in so finding, because the opinions of Drs. Bittner, Adams,

Schneider and Malcolm establish he is unable to maintain competitive employment.  But for the

reasons discussed above, the ALJ did not err in evaluating the opinions of Dr. Bittner, Dr. Adams

and Dr. Malcolm, and thus was not required to adopt them.  In addition, plaintiff has set forth no

specific argument regarding any error by the ALJ in evaluating the opinion of Dr. Schneider, and

thus the Court declines to find any here. See Carmicle, 533 F.3d at 1161 n.2; Paladin Associates,

Inc, 328 F.3d at 1164; Kim, 154 F.3d at 1000.  Plaintiff also challenges the ALJ's determination

at step five, arguing that the ALJ's limitation to simple, repetitive tasks is not consistent with the

description of the electronics worker and small parts assembler jobs contained in the Dictionaary

of Occupational Titles ("DOT").

Both of the above two jobs are described by the DOT as requiring Reasoning Level of 2.

See DOT 726.687-010, 1991 WL 679633; DOT 726.687-030, 1991 WL 679637.  Level 1 and

Level 2 reasoning are defined by the DOT as follows:

LEVEL 2

Apply commonsense understanding to carry out detailed but uninvolved
written or oral instructions. Deal with problems involving a few concrete

ORDER - 18

variables in or from standardized situations.

LEVEL 1

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT, Appendix C.  Given these definitions, plaintiff argues a restriction to simple, repetitive work equates with Level 1 reasoning, not Level 2 reasoning as required for the jobs identified by the vocational expert.  Accordingly, plaintiff asserts, the ALJ erred in finding him to be capable of performing them.

The undersigned disagrees the limitation to simple, repetitive work is commensurate with Level 1 reasoning in this case.  As this Court has noted in other cases, several courts have found Level 2 reasoning to be consistent with the ability to do simple, routine and/or repetitive work. See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1176 (10th Cir. 2005) (finding Level 2 reasoning to be more consistent with limitation to simple, routine work tasks); Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005) (finding limitation to simple and repetitive tasks to be closer to Level 2 reasoning); Flaherty v. Halter, 182 F.Supp.2d 824, 850-51 (D. Minn. 2001) (finding Level 2 reasoning did not conflict with limitation to work involving simple, routine, repetitive, concrete, and tangible tasks).

It is true that at least one court appears to disagree with this position. See Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997) (rejecting contention that claimant limited to following only simple instructions can engage in full range of sedentary work because many unskilled jobs in that category require reasoning levels of 2 or higher).  But again, the Court finds more persuasive the discussion of this issue provided by the United States District Court for the Central District of California:

ORDER - 19

This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for Meissl's other work as a stuffer given the ALJ's [residual functional capacity] finding limiting Meissl to "simple, repetitive" tasks. The Court finds that it does not.

As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" in "standardized situations with occasional or no variables." DOT at 1011. In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables . . . ." DOT at 1011. The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that Meissl could perform, namely a stuffer.

A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables ...." DOT at 1011. Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

Meissl focuses on the fact that the DOT description for a reasoning level of 2 uses the word "detailed." Essentially, Meissl seeks to equate the DOT's use of the word "detailed" with the Social Security regulations' use of the word "detailed instructions" in formulating a claimant's mental RFC. The Court is not convinced that such a neat, one-to-one parallel exists between the two.

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii); *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in

ORDER - 20

keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved."  This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels.  Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's [residual functional capacity] with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them.  A reasoning level of one on the DOT scale requires slightly less than this level of reasoning.  While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one.  A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required.  For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938.  Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed.  Other courts have so held. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir.2005) (holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart*, 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir.2004) ("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive").  As one court explained:

The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks.  Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation.  Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.

ORDER - 21

*Flaherty v. Halter*, 182 F.Supp.2d 824, 850 (D.Minn.2001).

Meissl v. Barnhart, 403 F.Supp.2d 981, 983-85 (C.D.Cal. 2005).  Accordingly, as did the court in

Meissl, this Court finds no inconsistency between the ALJ's limitation to simple, repetitive work

and the DOT requirement of Level 2 reasoning.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court finds the ALJ properly concluded plaintiff

was not disabled, and therefore hereby affirms the ALJ's decision.

DATED this 15th day of February, 2011.


Karen L. Strombom
United States Magistrate Judge

ORDER - 22